SEYMOUR, Circuit Judge,
concurring.
I fully join the per curiam opinion. Judge Lucero and I agree that the statute of limitations begins to run under the Mineral Leasing Act (“MLA”) with the “final decision of the Secretary,” 30 U.S.C. § 226-2, not when the plaintiffs receive notice required by the Administrative Procedure Act (“APA”), 5 U.S.C. § 555(e). See Per Curiam Op. at 1245-46. We also agree that the Energy Companies’ suit was untimely because the Secretary’s “final decision” occurred before February 12. Finally, we agree that the district court did not abuse its discretion by denying equitable tolling to the Energy Companies. See id. at 1246-48.
I also agree that the phrase “final decision of the Secretary” in § 226-2 of the MLA is unambiguous. But contrary to Judge Lucero’s view, it seems clear to me that when the Secretary makes a final decision for MLA purposes he is also taking “final agency action” pursuant to the APA. The word “final” bears the same meaning in the phrase “final decision of the Secretary,” 30 U.S.C. § 226-2, as it does in the phrase “final agency action” under the APA, 5 U.S.C. § 704. Accordingly, I agree with Judge Tymkovich that the decision to withdraw the leases at issue in this case could not have been sufficiently “final” to trigger the statute of limitations without also being “final” for the purposes of the APA.
A.
Judge Lucero concludes that the “final decision of the Secretary” could occur for statute of limitations purposes even if it did not constitute “final agency action.” Lucero Op. at 1251. In so doing, he unnecessarily complicates the MLA’s statute of limitations and ignores decades of administrative law construing the word “final” in various statutes consistently with the APA.
The word “final” has a settled meaning in administrative law.[1] Agency action is *1254 “final” for purposes of the APA, 5 U.S.C. § 704, when two conditions are satisfied: “First, the action must mark the ‘consummation’ of the agency’s decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which ‘rights or obligations have been determined,’or from which ‘legal consequences will flow.’ ” Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted).
The requirement of finality before judicial review is more than a mere formality. It acts as a restraint on unnecessary and premature judicial intervention in administrative decisionmaking. As such, it is intertwined with the ripeness doctrine, see Coal. for Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1250 (10th Cir.2001), which “prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also ... protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.” Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Even when a substantive statute — instead of the APA— authorizes judicial review of agency action, there is a “strong presumption” that “judicial review will only be available when agency action becomes final.” Bell v. New Jersey, 461 U.S. 773, 778, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983).
When interpreting the meaning of the word “final” in statutes using that term in relation to judicial review of agencies, courts commonly apply the APA’s meaning of “final.” In Whitman v. American Trucking Associations, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), the Court explained that the phrase “final action” in the Clean Air Act “bears the same meaning” as it does under the APA.[2] As Judge Tymkovich rightly points out, Whitman was no aberration. Federal courts regularly apply the APA’s meaning of “final” to other statutes using the term in relation to judicial review of agency actions and decisions. See Tymkovich Op. at 1261-62 (collecting cases); see also, e.g., Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 46-47 (1st Cir.2009) (applying Bennett framework to define “final action” in Telecommunications Act of 1996); Manufactured Housing Inst. v. U.S. Envtl. Protection Agency, 467 F.3d 391, 397 (4th Cir.2006) (applying Bennett to “final action of the Administrator” under Safe Drinking Water Act).
I see no sound reason to depart from this practice and adopt a novel definition of “final” for the MLA’s statute of limitations. There is no indication in the MLA that Congress intended “final” to mean something different than it does in administra *1255 tive law generally. In the absence of such indication, and given the presumption that a statute of limitations begins to run when the cause of action accrues, see Lucero Op. at 1249-50 (citing Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997)), we should interpret the MLA consistently with the APA.[3]
Judge Lucero agrees that “final” has the same meaning in both the MLA and APA, but disputes “that ‘agency action’ and ‘decision of the Secretary[1] have identical import.” Lucero Op. at 1251. This misses the mark. Here, the “agency action” under review is the “decision of the Secretary” to withdraw the leases. The APA defines “agency” to mean “each authority of the Government of the United States,” 5 U.S.C. § 551(1). This certainly includes the Secretary of the Interior when he is acting for the agency, as he was in this case. Thus, a “decision of the Secretary” to withdraw oil and gas leases under the MLA constitutes “agency action” under the APA.
The text of the MLA’s statute of limitations also indicates that the contested agency action is the same as the decision of the Secretary: the ninety-day limitations period applies to actions “contesting a decision of the Secretary.” 30 U.S.C. § 226-2. Because “agency action” and “decision of the Secretary” refer to the same event, the latter could not be final without the former also being so.
Even if “agency action” and “decision of the Secretary” could refer to separate events, Whitman counsels us to place little emphasis on this distinction:
The bite in the phrase “final action” ... is not in the word “action,” which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word “final,” which requires that the action under review mark the consummation of the agency’s decisionmaking process.
Whitman, 531 U.S. at 478, 121 S.Ct. 903 (citations and internal quotation marks omitted). Similarly, the bite in the phrase “final decision of the Secretary” is in the word “final.” The statute of limitations in this case only began to run when the Secretary’s decision to withdraw the leases bore the hallmarks of finality: a consummation of decisionmaking from which legal consequences flowed. See Bennett, 520 U.S. at 177-78, 117 S.Ct. 1154.
B.
Applying the Bennett framework to the events at issue here supports the conclusion that the “final decision of the Secretary” occurred February 6 at the latest.[4] *1256 Once Secretary Salazar issued the February 6 memorandum to BLM, his decision to withdraw the leases bore sufficient hallmarks of finality to trigger the MLA’s statute of limitations, 30 U.S.C. § 226-2.
First, the decision was “consummated” by February 6 at the latest. See Bennett, 520 U.S. at 178, 117 S.Ct. 1154. Several aspects of the February 4 announcement and February 6 memorandum demonstrate that this was so. In the February 4 press release, Secretary Salazar announced that the decision had already been made. See App. at 50 (“I have directed Bureau of Land Management not to accept the bids on the 77 parcels.... ” (emphasis added)). The announcement admitted of no hesitation and offered no indication that the decision was either “tentative or interlocutory in nature.” Bennett, 520 U.S. at 178, 117 S.Ct. 1154. It simply indicated that his decisionmaking was complete.
More importantly, the Secretary himself — not a subordinate official — made the decision to withdraw the leases. “An agency action is not final if it is only ‘the ruling of a subordinate official,’ or ‘tentative.’ ” Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 151, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). When BLM makes a leasing decision, an adversely affected party may ordinarily appeal the decision to the Interior Board of Land Appeals (“IBLA”). 43 C.F.R. § 4.410(a). The IBLA will then usually render the final decision on the matter.[5] Id. § 4.403(a) (“The Board’s decision is final agency action and is effective on the date it is issued, unless the decision itself provides otherwise.”). Where “a decision has been approved by the Secretary,” however, the IBLA lacks authority to hear such an appeal. Id. § 4.410(a)(3).
In this case, the Secretary himself intervened to make the final decision. See id. § 4.5(a). As a result, once Secretary Salazar issued his written directive to BLM to withdraw the leases, no additional agency review was permissible under the law.[6] The Secretary’s memo indicates no departure from this practice. It did not grant any discretion to BLM officials regarding the withdrawal. Instead it directed BLM to comply with the decision to withdraw the leases. See App. at 52 (“I am directing you to withdraw the 77 parcels.... [P]lease take all necessary actions to effectuate this withdrawal.... ”). Because the Secretary’s directive to BLM was unreviewable, the agency had “completed its decision-making process,” Franklin, 505 U.S. at 797,112 S.Ct. 2767.
Second, legal consequences flowed from the Secretary’s decision. When the Energy Companies were recognized as high bidders on the leases, they were informed that the issuance of the leases was contingent on resolution of any protests. As a result, the Energy Companies were on *1257 notice that their right to the leases was not absolute. When the Secretary effectively decided the protest issues and directed BLM to withdraw the leases, whatever authority BLM had to proceed with issuing the leases evaporated.[7] As already explained, the Secretary’s decision was unreviewable, and BLM officials had no choice but to comply. The Secretary’s directive to BLM therefore conclusively determined that the leases would not be issued to the Energy Companies.
It is clear that BLM officials believed the Secretary’s decision had conclusively determined the legal rights of the Energy Companies even before he committed the decision to writing on February 6. On February 5, both the government’s motion filed in the D.C. District Court and the Utah State Director’s memo reflected that the Secretary had completed his decision-making and the leases would no longer be issued. The February 5 memorandum requested a written decision only “to document the process.” Fed. Aple. Supp.App. at 7. It offered no indication that the decision had not yet been made, or that BLM believed itself to be free to proceed with issuing the leases until it received the written documentation of the Secretary’s decision. By the same token, the government informed the D.C. District Court that the Secretary’s decision had been made: “Accordingly, those leases will not be issued.” Fed. Defs. Unopposed Motion to Stay Briefing Schedule, S. Utah Wilderness Alliance v. Allred, No. 08-2187 (D.D.C. Feb. 5, 2009), ECF No. 66. Thus, legal consequences flowed from the Secretary’s directive to BLM.
Judge Tymkovich argues that the February 6 memo could not be the final agency action here because the memo did not withdraw the leases but instead anticipated that further steps would be needed to effectuate the withdrawals. See Tymkovich Op. at 1264-65. Respectfully, I disagree. The steps that followed, including the February 12 letters to the Energy Companies, were nothing more than ministerial tasks carrying out the Secretary’s directive. In these short letters, subordinate officials merely notified the high bidders that Secretary Salazar had “directed the BLM to withdraw these parcels.” Aplt. Add. at 24. The letters did not provide any rationale for the withdrawal. They did not determine the legal rights of the recipients; Secretary Salazar had already definitively determined the leases would not be issued. As such, the letters do not undermine the finality of the Secretary’s order to withdraw the leases. When the head of an agency conclusively renders a decision determining the rights of the parties, that decision is final notwithstanding that subordinate officials are needed to implement the decision. Ctr. For Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir.2007) (“If an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency’s action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process.” (internal quotation marks and alterations omitted)).
Judge Tymkovich’s dissent also denies that the agency action could have been final by February 6th because agency regulations require the Secretary’s “written decision” to be “issued,” 43 C.F.R. § 4.5(c), and, in its view, no issuance occurred until the letters were transmitted to the affected parties. See Tymkovich Op. at 1265. *1258 Notably, however, the provision does not expressly require the “written decision” to be “issued” to the affected parties. Instead, it provides:
If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.
Id. Although notice is required, it is at least arguable whether the “written decision” itself must be transmitted to the affected parties.
The dissent relies on Southern Pacific Pipe Lines, Inc. v. U.S. Dep’t of Transportation, 796 F.2d 539, 540 n. 1 (D.C.Cir. 1986), to bolster its claim that the Secretary’s decision was not “issued” until the February 12 letters were sent. In Southern Pacific, the court held that regulations were “issued” and triggered a statute of limitations when published in the Federal Register. But in reaching that conclusion, the court emphasized the “parties agree[d] that there was no public notice of the final regulations prior to their publication in the Federal Register, and that [the plaintiff] had no actual notice of the regulations prior to that date.” Id. Here, in contrast, there was public notice of the withdrawal of leases prior to February 12, because the decision was announced publicly via press release, press conference, and on the internet. Nor was actual notice lacking; the Energy Companies have never claimed they were unaware of the withdrawal of the leases until they received the letters. Thus, Southern Pacific is inapposite.
Certainly the Department of the Interi- or could have handled this process differently. The February 6 memorandum could have been labeled a “decision,” the press release could have been issued after the memorandum had been sent to BLM, and the affected parties could have been told the specific date that this decision had occurred. But the agency’s sloppiness does not render the Secretary’s decision to withdraw the leases any less final or legally binding. Cf. Whitman, 531 U.S. at 479, 121 S.Ct. 903 (“Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final.”). And, as the Per Curiam Opinion explains, the issues of notice go to tolling, not to finality. See Per Curiam Op. at 1245-46, 1246-48.
C.
Judge Tymkovich offers a parade of horribles that might follow from our decision that the Energy Companies’ suit was untimely. See Tymkovich Op. at 1267-68. Respectfully, I believe these concerns are unwarranted. The Secretary’s decision to withdraw the leases does not remotely resemble the secret decisions and internal deliberations that the dissent fears will now trigger judicial review. The withdrawals were not made in secret. Instead, they were trumpeted through a press release, on the internet, and in news reports. The government announced the withdrawal again on February 5 through a document filed in federal court, providing actual notice to at least one of the plaintiffs and several plaintiff attorneys. A “secret decision” by an agency could certainly raise concerns about finality and notice, but that is not the case before us. Cf. Mesa Airlines v. United States, 951 F.2d 1186, 1188 (10th Cir.1991) (ALJ decision was “entered” and final when ALJ signed and dated order and made it public); ITT World Commc’ns, Inc. v. FCC, 621 F.2d 1201, 1209 (2d Cir.1980) (Mansfield, J„ concurring) (agency action was “final” and statute of limitations began to run when agency held public meeting and issued news release of meeting minutes notwith *1259 standing that full opinion was not released until several weeks later).[8]
The dissent also suggests that because the Secretary might have “changed his mind,” his decision was not final until effectuated by BLM. Tymkovich Op. at 1266. I disagree. “[T]he mere possibility of future agency reconsideration” does not defeat finality. 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3942 (3d ed.2008); see, e.g., Finer Foods, Inc. v. U.S. Dept of Ague., 274 F.3d 1137, 1139 (7th Cir.2001) (“The prospect that some future administrative case may (or may not) begin does not make the ongoing suspension any the less final.”). The Secretary’s decision to withdraw the leases and his reasons for doing so were clearly expressed in the press conference, the press release, and the memorandum. No entity within the Department of the Interior had the authority to review his decision. Agency lawyers even asked a federal court to rely on the withdrawal decision. Some speculation that Secretary Salazar would suddenly reverse course cannot defeat the finality of his decision.
In sum, by February 6 Secretary Salazar had declared in a written statement that the leases would not be issued, had publicly announced that decision, and had ordered subordinate officials to complete the ministerial steps required to effectuate withdrawing the leases from the sale. All of the hallmarks of finality were present. Because the “final decision of the Secretary,” 30 U.S.C. § 226-2, occurred no later than February 6, the Energy Companies’ complaint was untimely.

. To the extent one might find the phrase "final decision of the Secretary” to be ambig *1254 uous, I would still apply the APA's definition of "final.” Statutes that are in pari materia— dealing with the same subject matter — should be construed consistently with each other. See Planned Parenthood of Rocky Mountains Servs., Corp. v. Owens, 287 F.3d 910, 923 n. 13 (10th Cir.2002); Erlenbaugh v. United States, 409 U.S. 239, 243, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) ("The rule of in pari materia ... is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context.”). Because the APA and § 226-2 of the MLA both concern judicial review of administrative actions, the two should be construed consistently-

. The Clean Air Act provides for judicial review of the promulgation of various air quality regulations and other "final action[s] taken, by the Administrator” of the Environmental Protection Agency. 42 U.S.C. § 7607(b)(1). A petition for review must generally be filed "sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register.” Id.

. Of course, the default rule that a statute of limitations runs when the cause of action accrues is not absolute. But I disagree with Judge Lucero that Graham County and Dodd push us to start the clock in this case before the cause of action accrued. See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005); Dodd v. United States, 545 U.S. 353, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005). Neither Dodd nor Graham County involved judicial review of agency action, and neither case sheds any light on whether the text of the MLA’s statute of limitations is ambiguous. To the extent these cases are relevant, however, Graham County counsels that Judge Lucero’s recommended interpretation of 30 U.S.C. § 226-2 is to be avoided. Where "there are two plausible constructions of a statute of limitations, we should adopt the construction that starts the time limit running when the cause of action ... accrues.” Graham Cnty., 545 U.S. at 419, 125 S.Ct. 2444.

. We need not decide whether the Secretary's decision was final on February 4, the date the Secretary publicly announced his decision, or February 6, the date he documented the decision in accordance with the Department’s regulations. The plaintiffs’ complaint was untimely regardless of whether February 4 or *1256 February 6 started the ninety-day limitations period. See Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm’n, 711 F.2d 279, 287 (D.C.Cir.1983) ("We need not select between [the two possible dates], however, because the date the Committee eventually filed its petition ... was long past the 30-day period triggered by either time.”).

. The Secretary has discretion to review decisions issued by the IBLA. See 43 C.F.R. § 4.5(a)(2); cf. United States v. Navajo Nation, 537 U.S. 488, 496 n. 3, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (interpreting § 4.5(a) as allowing the Secretary to review decisions by the Board of Indian Appeals).

. Under the Department of the Interior’s regulations, when the Secretary personally assumes jurisdiction of a case or reviews a decision made in the agency, a written decision must be issued. 43 C.F.R. § 4.5(c). On February 6, Secretary Salazar provided that written documentation of his decision by signing and issuing a memorandum to BLM’s Utah State Director.

. Of course, the leases were already subject to a temporary restraining order from the D.C. District Court.

. Judge Mansfield's concurrence received a second vote and was controlling as to this issue.

. Irwin v. Dep’t of Veterans Affairs, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), does not command otherwise. There, it was undisputed that the plaintiff missed a statutory filing deadline; the only question was whether equitable tolling was potentially available. See id. at 95, 111 S.Ct. 453. I agree that equitable tolling is inappropriate in this case — though it may be worth noting that the Court in Irwin actually ruled in favor the plaintiff, finding that application of equitable tolling was presumptively permissible. See id. at 96, 111 S.Ct. 453.