PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

T-MOBILE NORTHEAST LLC,

               *Plaintiff-Appellant,*

         v.

FAIRFAX COUNTY BOARD OF
SUPERVISORS,

             *Defendant-Appellee,*

         and

FAIRFAX COUNTY, VIRGINIA,

             *Defendant.*

<br>

FEDERAL COMMUNICATIONS
COMMISSION,

             *Amicus Curiae,*

CITY OF ARLINGTON, TEXAS;
INTERNATIONAL MUNICIPAL LAWYERS
ASSOCIATION; NATIONAL ASSOCIATION
OF COUNTIES; NATIONAL ASSOCIATION
OF TELECOMMUNICATIONS OFFICERS
AND ADVISORS; NATIONAL LEAGUE
OF CITIES; UNITED STATES CONFERENCE
OF MAYORS,

         *Amici Supporting Appellee.*

No. 11-1060

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:10-cv-00117-GBL-JFA)

Argued: October 26, 2011

Decided: March 1, 2012

Before AGEE, DAVIS, and KEENAN, Circuit Judges.

---

Affirmed by published opinion. Judge Keenan wrote the majority opinion, in which Judge Agee joined. Judge Agee wrote a separate concurring opinion. Judge Davis wrote a separate opinion concurring in part and dissenting in part.

---

### COUNSEL

**ARGUED:** Thomas Scott Thompson, DAVIS, WRIGHT & TREMAINE, LLP, Washington, D.C., for Appellant. Elizabeth Doyle Teare, COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellee. **ON BRIEF:** David P. Bobzien, County Attorney, COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellee. Austin C. Schlick, General Counsel, Peter Karanjia, Deputy General Counsel, Richard K. Welch, Acting Associate General Counsel, James M. Carr, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Federal Communications Commission, Amicus Curiae. Joseph Van Eaton, James R. Hobson, Matthew K. Schettenhelm, MILLER & VAN EATON, PLLC, Washington, D.C., for Amici Supporting Appellee.

---

### OPINION

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider certain "prohibition" and "discrimination" challenges brought by a wireless telecommuni-

cations provider against a local governing body under a provision of the Telecommunications Act of 1996 (the Act). 47 U.S.C. § 332(c)(7)(B)(i). We review the district court's holding that the Board of Supervisors of Fairfax County, Virginia (the Board), did not violate the Act in denying a request filed by T-Mobile Northeast, LLC (T-Mobile), to construct a wireless service facility on an existing transmission pole.

The Act bars local governing bodies regulating the placement and modification of personal wireless service facilities: 1) from unreasonably discriminating among similar service providers; and 2) from prohibiting, or effectively prohibiting, wireless services. *Id.* We decide whether the district court properly applied our standards for resolving prohibition and discrimination claims brought under this statute. We also consider whether a declaratory ruling issued by the Federal Communications Commission (FCC) in 2009 affects our established standards. Upon our review, we affirm the district court's judgment that the Board's decision denying T-Mobile's request to construct a wireless facility did not violate the Act.

I.

In 2009, T-Mobile, a company providing wireless telecommunications services to its customers, filed two related applications with the Fairfax County Planning Commission (Planning Commission) and the Board. T-Mobile filed these applications seeking to increase the height of an existing utility transmission pole (the pole) from 100 feet to 110 feet, and to attach to the extended portion of the pole a wireless facility consisting of three panel antennas. These proposed antennas each would have a height of almost five feet, and a width of twelve inches, and would be arranged in a cylindrical configuration around the top of the pole. The proposed pole extension would be grey in color, and the panel antennas would be painted grey to match the extension.

The pole is situated on a public right-of-way near an area zoned for residential use, at the intersection of Colonial Farm Road, Dolley Madison Boulevard, and Georgetown Pike, an historic scenic byway. Several residential neighborhoods are located near the public right-of-way. The Evermay residential subdivision is the neighborhood most affected by the visual impact of the pole.

In its application filed under Virginia Code § 15.2-2232, T-Mobile was required to obtain a determination from the Planning Commission regarding whether the proposed facility substantially conformed with Fairfax County's Comprehensive Plan (the County's comprehensive plan). T-Mobile also was required under the Fairfax County Zoning Ordinance (the Zoning Ordinance) to obtain a special exception from the Board by showing that the proposed facility would be "harmonious with and [would] not adversely affect the use . . . of neighboring properties." Zoning Ordinance § 9-006(3).

At the time T-Mobile filed its applications, both Verizon Wireless (Verizon) and AT&T Wireless, formerly New Cingular Wireless, P.C.S., L.L.C. (AT&T), competitors of T-Mobile, had received permission to place panel antennas on the pole. In 2004, Verizon was permitted to extend the pole from its height of 90 feet, to a height of 100 feet, and to attach 12 antennas around the pole. Before Verizon's application ultimately was approved, that application was opposed by the residents of the Evermay community due to the increased height of the pole.

In 2006, the Planning Commission permitted AT&T to install nine panel antennas below Verizon's antennas on the pole. Residents of the Evermay community did not object to the placement of these antennas on the pole and, based on the specifications of AT&T's proposed facility, AT&T's application did not require a public hearing.

T-Mobile's applications contained a statement asserting that the area along the George Washington Parkway, George-

town Pike, and Dolley Madison Boulevard in Fairfax County did not have adequate service from T-Mobile due to the absence of a nearby wireless T-Mobile facility. T-Mobile also represented that its objective in constructing the proposed facility was to "solidify in-vehicle coverage" along the roads previously mentioned, and to "eliminate the in-building coverage gap in the surrounding neighborhoods." T-Mobile explained that it had considered, but "ruled out," alternative sites for its proposed facility.

In September 2009, the Planning Commission staff issued a report recommending that the Planning Commission find that T-Mobile's proposed facility satisfied the criteria of location, character, and extent, as specified in Virginia Code § 15.2-2232, and that the proposed facility was in accord with the County's comprehensive plan. In November 2009, the Planning Commission held a public hearing on the matter. After that hearing, the Planning Commission denied T-Mobile's application on the grounds that the visual impact of the proposed facility would be "significant and adverse," and that the location, character, and extent of the proposed facility was not substantially in accord with the County's comprehensive plan. The Commission also recommended that the Board deny T-Mobile's application for a special exception.

T-Mobile filed an appeal to the Board, which held hearings to consider both T-Mobile's application and its request for a special exception. At the hearing before the Board, a representative from the Evermay community expressed the community's strong opposition to the proposed extension of the pole, citing the increased visibility of the higher pole and the alleged adverse impact that the altered pole would have on the residents' use and enjoyment of their properties. The Board also considered presentations from Planning Commission staff members and from representatives of T-Mobile.

The Board determined that T-Mobile's proposed facility was not in conformance with the County's comprehensive

plan, and failed to comply with the Zoning Ordinance's mandatory standards for approval of special exceptions. Accordingly, the Board denied T-Mobile's application and request for a special exception.

T-Mobile filed a complaint in the district court against the Board,[1] as permitted by 47 U.S.C. § 332(c)(7)(B)(v).[2] In its complaint, T-Mobile asserted that the Board's denials violated certain provisions of the Act, which place limitations on a local governing body's decisional authority regarding the placement and modification of personal wireless service facilities. 47 U.S.C. § 332(c)(7)(B). After T-Mobile and the Board filed cross-motions for summary judgment, the district court granted summary judgment in favor of the Board, and T-Mobile timely filed the present appeal.

## II.

In 1996, the Act was signed into law. Section 704(c)(7) of the Act, entitled "Preservation of local zoning authority," is codified in 47 U.S.C. § 332(c)(7). Pub. L. No. 104-104, 110 Stat. 56 (1996). That section includes two parts that are relevant to this appeal. Part (A), entitled "General authority," states that

> [e]xcept as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

---

[1]T-Mobile also named Fairfax County as a defendant, but the district court granted the County's motion to dismiss. T-Mobile does not challenge that ruling on appeal.

[2]The provision authorizing T-Mobile's suit, 47 U.S.C. § 332(c)(7)(B)(v), provides that any person adversely affected by a final action by a local governing body that is inconsistent with 47 U.S.C. § 332(c)(7)(B) may, within 30 days, commence an action in any court of competent jurisdiction.

47 U.S.C. § 332(c)(7)(A). Part (B) of this same section imposes limitations on this general authority. 47 U.S.C. § 332(c)(7)(B). Two of the enumerated limitations in part (B) are at issue in this appeal.[3] Those provisions state:

> (i)   The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government instrumentality thereof –
>
> > (I)    shall not unreasonably discriminate among providers of functionally equivalent services; and
> >
> > (II)   shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B).

We previously have explained that § 332(c)(7) of the Act reflects the balance between the national interest of facilitating the growth of telecommunications and the interest of local governments in making decisions based on zoning considerations. *360° Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79, 86 (4th Cir. 2000) (*Albemarle County*). The protection of this balance has been a primary concern in our development of standards to address claims brought under § 332(c)(7).

---

[3]Another statutory limitation on a local governing body's authority was raised in T-Mobile's complaint filed in the district court. T-Mobile asserted that the Board's decision denying T-Mobile's applications was not supported by substantial evidence, in violation of 47 U.S.C. § 332(c)(7)(B)(iii). The district court granted summary judgment in favor of the Board on this claim, and T-Mobile does not challenge that ruling on appeal.

## III.

We review the district court's award of summary judgment de novo. *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 755 (4th Cir. 2010). Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

On appeal, T-Mobile argues that the district court erred in concluding that: 1) the Board's denial of T-Mobile's applications did not effectively prohibit personal wireless services under 42 U.S.C. § 332(c)(7)(B)(i)(II) (hereafter, subsection (B)(i)(II)); and 2) the Board did not unreasonably discriminate against T-Mobile under 42 U.S.C. § 332(c)(7)(B)(i)(I) (hereafter, subsection (B)(i)(I)). We will address each of these arguments in turn.

## A.

## 1.

We first consider T-Mobile's claim that the Board's denial of T-Mobile's applications effectively prohibited T-Mobile from providing wireless service to the nearby area in violation of subsection (B)(i)(II). Before we reach the merits of this claim, however, we begin by addressing T-Mobile's arguments regarding our standard for reviewing claims raised under subsection (B)(i)(II).

T-Mobile contends that in our prior decisions, we have held that subsection (B)(i)(II) is violated only by a "blanket ban" on wireless deployment, with the result that individual zoning decisions may never constitute a prohibition of wireless services under the Act. According to T-Mobile, in 2009, the FCC rejected such a "blanket ban" approach as being inconsistent with the language and the purpose of the Act. *See In re Peti-*

*tion for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, 24 FCC Rcd. 13994 (F.C.C. 2009) (*In re Petition*). T-Mobile contends that the FCC's ruling is entitled to deference, and that under that ruling, we are required to adopt a new standard for the review of prohibition claims brought under (B)(i)(II). We disagree with T-Mobile's arguments.

Our previous opinions addressing subsection (B)(i)(II) have established certain principles, which guide the review of challenges brought under that subsection. In our decision in *AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423 (4th Cir. 1998) (*Virginia Beach*), we considered a local governing body's denial of an application submitted jointly by four telecommunication companies, which sought approval to construct two communications towers in a residential area. *Id.* at 424. There, the district court concluded that the local governing body had not effectively prohibited personal wireless service, within the meaning of subsection (B)(i)(II), because that subsection only applied to "blanket prohibitions" or "general bans or policies" against the provision of wireless services. *Id.* at 428.

We disagreed with the district court's narrow interpretation of (B)(i)(II), and explained that policies essentially guaranteeing the rejection of all wireless facility applications, as well as explicit policies or bans against the granting of such applications, would constitute an unlawful prohibition of personal wireless services in violation of subsection (B)(i)(II). *Virginia Beach*, 155 F.3d at 429. However, based on the record in that case, we ultimately affirmed the district court's judgment that the local governing body had not violated subsection (B)(i)(II).

Two years later, we addressed the question whether a single denial of a site permit could ever violate subsection (B)(i)(II). *Albemarle County*, 211 F.3d at 86. While acknowledging that generally a single denial of a permit for a particular site will not be construed as a prohibition of wireless services, we

explained that the circumstances surrounding the denial of a single application, or the circumstances surrounding the procedure for processing that application, could amount to a prohibition of wireless services. *Id.* at 86.

Even though the most obvious violation of (B)(i)(II) would involve a "blanket ban" on wireless service, we have instructed reviewing courts to consider, on a case-by-case basis, the facts surrounding a local governing body's denial of an application. *Id.* at 87. We therefore disagree with T-Mobile's attempt to characterize our precedent as holding that subsection (B)(i)(II) may be violated *only* by a "blanket ban" on wireless deployment.

Under our precedent, a plaintiff can prevail in asserting a violation of subsection (B)(i)(II) by showing that a local governing body has a general policy that essentially guarantees rejection of all wireless facility applications. *Albemarle County*, 211 F.3d at 86; *Virginia Beach*, 155 F.3d at 429. Alternatively, a plaintiff can prevail by demonstrating that the denial of an application for one particular site is "tantamount" to a general prohibition of service. *Albemarle County*, 211 F.3d at 87-88. In asserting a claim under this alternative theory, a plaintiff may prevail upon showing both an effective absence of coverage, and a lack of reasonable alternative sites to provide coverage. *See id.* at 87-88.

With regard to the requirement that a plaintiff demonstrate the absence of reasonable alternatives, we specifically rejected the standard adopted by other circuits permitting a plaintiff to establish merely that its proposed facility constitutes "the least intrusive means to close a significant gap in service." *Albemarle County*, 211 F.3d at 87 (citing *APT Pittsburg Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 (3d Cir. 1999); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999)); *see also MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715 (9th Cir. 2005) (adopting least intrusive means test after our decision in *Albemarle*

*County*). We explained that the "least intrusive means" standard "unduly limit[s] what is essentially a fact-bound inquiry," and that a local governing body rationally could "reject the least intrusive proposal in favor of a more intrusive proposal that provides better service." *Id.* We also explained that such a standard improperly would create a presumption favoring the wireless industry over the interests of the local community, shifting the burden of production to the local governing body. *Id.*

We further explained that the application of any specific formula, such as the above formula adopted by some of our sister circuits, ultimately would require a broader inquiry whether the denial of a permit for a particular site had the effect of prohibiting wireless services, within the meaning of subsection (B)(i)(II). *Id.* Thus, we concluded that reviewing courts should not be constrained by any specific formulation, but should conduct a fact-based analysis of the record, as contemplated by the Act, in determining whether a local governing body violated subsection (B)(i)(II). *Id.*

Within these boundaries set by our precedent, a plaintiff in this Circuit thus may prove a violation of subsection (B)(i)(II) based on a single denial of a site application, and not merely by demonstrating a "blanket ban" on wireless deployment. With this discussion in mind, we turn to consider T-Mobile's argument that our precedent has been affected by a declaratory ruling issued by the FCC in 2009.

In its narrow ruling, the FCC concluded that when a site application is denied based on a finding that another provider already offers service in the area, such denial violates subsection (B)(i)(II). *In re Petition*, 24 FCC Rcd. at 14017 ¶ 58. The present case, however, is not affected by the FCC's decision, because T-Mobile does not allege that the Board's decision was based on a finding that the area to be served by T-Mobile's proposed facility also was served by another provider.

Moreover, we observe that the language in the FCC's ruling supports our construction of subsection (B)(i)(II). The FCC stated that when "a bona fide local zoning concern, rather than the mere presence of other carriers, drives a zoning decision, it should be unaffected by our ruling today." *Id.* at 14018 ¶ 62. Thus, the FCC specifically emphasized that a local governing body's "authority to base zoning regulation on other grounds is left intact by this ruling." *Id.* at 14017 ¶ 60.

The FCC's ruling cited only one case from this Circuit, our decision in *Virginia Beach*. *In re Petition*, 24 FCC Rcd. at 14017 ¶ 60. The FCC's citation to this case was limited to explaining the FCC's position that its ruling would not strip a local governing body's authority of its zoning rights, a concern we expressed in *Virginia Beach*. *Id.* Thus, we conclude that our precedent regarding the interpretation of subsection (B)(i)(II), as detailed in our decision in *Albemarle County*, is unaffected by the FCC's ruling. Accordingly, we decline to depart from that precedent and reject T-Mobile's proposal that we adopt a "least intrusive means" test, or any other specific test, for the review of claims raised under subsection (B)(i)(II).

2.

Within this legal framework, we consider the record before us to determine whether the Board's decision effectively prohibited personal wireless service, within the meaning of section (B)(i)(II). In asserting that the Board violated subsection (B)(i)(II), T-Mobile contends that it has shown a legally cognizable absence in coverage in the area surrounding the proposed facility and that, without the proposed facility, T-Mobile will remain unable to provide sufficient, reliable in-vehicle and in-building coverage in the area at issue.

T-Mobile also contends that it has investigated numerous alternative sites for its facility but that those sites were techni-

cally infeasible, practically unavailable, or inconsistent with the County's comprehensive plan.[4] Thus, T-Mobile contends that the Board's denial of its applications effectively prohibited the provision of wireless services. We disagree with T-Mobile's arguments.

Initially, we emphasize that a plaintiff's burden to prove a violation of subsection (B)(i)(II) is substantial and is particularly heavy when, as in this case, the plaintiff already provides some level of wireless service to the area. *Albemarle County*, 211 F.3d at 87-88. This substantial burden is consistent with the plain language of subsection (B)(i)(II), which is violated only when a local governing body's decision prohibits or has the effect of prohibiting personal wireless services. *See Albemarle County*, 211 F.3d at 88 n.1. Importantly, the language of this subsection does not encompass the ordinary situation in which a local governing body's decision merely limits the level of wireless services available because, as we have explained, the Act cannot guarantee 100 percent coverage. *Id.*

As discussed above, a plaintiff must meet one of two standards to prevail under subsection (B)(i)(II). The plaintiff must establish: 1) that a local governing body has a general policy that effectively guarantees the rejection of all wireless facility applications, *Albemarle County*, 211 F.3d at 87; *Virginia Beach*, 155 F.3d at 429; or 2) that the denial of an application for one particular site is "tantamount" to a general prohibition of service, *Albemarle County*, 211 F.3d at 87-88.

In asserting a claim under this second theory, as T-Mobile does here, a plaintiff must show a legally cognizable deficit in coverage amounting to an effective absence of coverage,

---

[4]T-Mobile also asserts that the proposed facility was the "least intrusive" alternative to providing adequate coverage. However, as explained above in section III(A)(1), this Court has rejected the "least intrusive means" analysis. *See Albemarle County*, 211 F.3d at 87. Therefore, we do not consider T-Mobile's argument on this issue.

and that it lacks reasonable alternative sites to provide coverage. *See id.* at 87-88. We also have stated that the plaintiff should be able to demonstrate that further reasonable efforts to gain approval for alternative facilities would be "fruitless." *See USCOC of Virginia RSA#3, Inc. v. Montgomery Cnty. Bd. of Supervisors*, 343 F.3d 262, 269 (4th Cir. 2003); *Albemarle County*, 211 F.3d at 88.

In *Albemarle County*, as in this case, the wireless provider and the local governing body filed cross-motions for summary judgment. 211 F.3d at 83. We reversed the district court's decision granting the provider's motion on its prohibition claim, concluding that the provider failed to meet its heavy burden under section (B)(i)(II). We explained that the record was unclear regarding whether there was an absence of service in a particular part of the county. *Id.* at 87-88. We further stated that, even assuming the existence of cognizable gaps in coverage, the record contained insufficient evidence to establish whether there were alternative locations available for the proposed wireless facilities. *Id.* at 88.

Additionally, we observed that the record showed that the local governing body had approved numerous applications for other wireless facilities, including several filed by the provider asserting a violation of the Act. *Id.* Thus, we concluded that the provider failed to meet its heavy burden to show that the denial of its permit for a particular site amounted to a general prohibition of service. *Id.*

In our view, like the provider in *Albemarle County*, T-Mobile has failed to carry its heavy burden in this case. Even if we assume, without deciding, that T-Mobile established a gap in coverage sufficient to make a claim under subsection (B)(i)(II), we conclude that on this record T-Mobile failed to show that it lacks reasonable alternatives to provide service in the area at issue, and failed to show that further attempts to gain the Board's approval would be futile.

T-Mobile's evidence of alternative sites submitted to the district court included several declarations, along with some exhibits, completed by persons who explored alternative locations or assisted in doing so. In our view, the content of those declarations presents very general conclusions regarding the feasibility of alternative locations, including repeated assertions that the locations "would not close the significant gap in T-Mobile's coverage" and "would not allow T-Mobile to meet its coverage objectives." T-Mobile cannot meet its burden of proving that the Board's denial was "tantamount" to a general effective prohibition on services by showing merely that the alternative sites would not close the entire deficiency in coverage, or would not provide the same level of service as the proposed facility.

With regard to T-Mobile's assertion that the alternative locations were unavailable as a practical matter, we agree with the district court's conclusion that T-Mobile inadequately addressed the viability of one particular alternative site in Langley Fork Park (the park). The record before us contains a statement made by a National Park Service representative indicating that the park "would be open to receiving" a proposal for the construction of a pole, similar to others that had been approved at area parks in the past. Even though the park's policy prohibits the placement of poles in the park until other alternatives are eliminated, the difficulties presented in meeting such restrictions are insufficient to establish that a provider lacks reasonable alternatives for the provision of its services.

We also agree with the district court's conclusion regarding T-Mobile's argument that the alternate locations discussed were inconsistent with the County's comprehensive plan. Under its heavy burden, it is inadequate for T-Mobile to assert simply that the County's comprehensive plan states a preference for collocating wireless facilities on existing poles, rather than for constructing entirely new facilities. The County's stated preference for one type of facility is insufficient to

show that other types of alternative facilities are not reasonably available in a particular case.

Finally, we observe that T-Mobile has failed to present evidence that future attempts to gain approval for wireless facilities to enhance its coverage would be fruitless. To the contrary, the record demonstrates that the Board has a strong history of approving wireless facilities, including applications for wireless facilities submitted by T-Mobile.

Accordingly, based on the record before us, we conclude that T-Mobile has failed to meet its heavy burden to show that the Board's denial of the applications for a single wireless facility amounted to a general effective prohibition on wireless service, in violation of subsection (B)(i)(II). Therefore, we hold that the district court did not err in granting summary judgment to the Board on this claim.

## B.

We next consider whether the Board unreasonably discriminated against T-Mobile by denying its applications, in violation of subsection (B)(i)(I). T-Mobile bases its contention of unreasonable discrimination on the fact that the Board previously permitted both Verizon and AT&T, two companies offering the same or similar services as T-Mobile, to construct expanded facilities on the pole. Before addressing the merits of this argument, we review the standard applicable to our consideration of a claim alleging a violation of subsection (B)(i)(I).

T-Mobile contends that the district court, in determining that the record failed to show that the Board unreasonably discriminated against T-Mobile, incorrectly interpreted our decision in *Virginia Beach*, the only case in which we have addressed subsection (B)(i)(I). According to T-Mobile, we failed to adopt a standard in *Virginia Beach* for considering claims raised under subsection (B)(i)(I). T-Mobile urges us to

employ a test used in other circuits, namely, whether the petitioning provider and other providers are "functionally equivalent," and whether the petitioning provider's proposed facility and the other facilities are "similarly situated." *See Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 392 (3d Cir. 2007); *MetroPCS*, 400 F.3d at 728. We decline T-Mobile's invitation and disagree with its characterization of our precedent.

We begin by reviewing our discussion in *Virginia Beach* addressing subsection (B)(i)(I). As stated above, in that case, the local governing body had denied an application submitted jointly by four telecommunication companies to construct two towers in a residential area. *Id.*, 155 F.3d at 424. Although the district court concluded that the local governing body unreasonably discriminated against the applicants, we reversed the district court's decision. *Id.*

In their appeal to this Court, the parties in *Virginia Beach* presented opposing views regarding the proper interpretation of subsection (B)(i)(I). *Id.* at 426-27. After considering the parties' arguments, we declined to adopt a fixed test for determining unreasonable discrimination under subsection (B)(i)(I), and instead focused our review on the facts and circumstances surrounding the local governing body's decision. *Id.* at 427.

We explained that because the application at issue was submitted by four different telecommunication providers, each of which offered varying types of services, the local governing body plainly had not discriminated against any particular provider or type of service. *Id.* We emphasized that only *unreasonable* discrimination was prohibited under the statute, and stated that even if the local governing body had discriminated against the applicants, such discrimination was not unreasonable. *Id.*

We based our conclusion on the fact that the local governing body's decision rested on traditional zoning principles,

including the preservation of neighborhood character and the avoidance of aesthetic blight, and on the absence of evidence that the local governing body intended to favor one company or form of service over another. *Id.* We explained that if this action by the local governing body were held unreasonable, then almost every denial of an application necessarily would violate subsection (B)(i)(I). *Id.*

In support of this conclusion, we cited a House of Representatives Conference Report, in which the conferees expressed their intent that subsection (B)(i)(I) provide "localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." *Virginia Beach*, 155 F.3d at 427 n.3 (quoting H.R. Rep. No. 104-458, at 208 (1996) (Conf. Rep.)). We also described the evidence in the record supporting the local governing body's decision, noting both the significant opposition voiced by community members based on aesthetic concerns, and the lack of evidence suggesting "ill will" toward the applicants or their services. *Id.* at 427-28.

While T-Mobile is correct that our decision in *Virginia Beach* did not adopt a specific test for the review of unreasonable discrimination claims, we nevertheless established a framework for analyzing such claims. Under this framework, we carefully considered the language of subsection (B)(i)(I) and the evidence supporting the local governing body's decision. We concluded that the local governing body had not unreasonably discriminated against the applicants for several reasons, including that the local governing body's decision was based on legitimate concerns involving traditional zoning principles.

In the present case, the district court properly applied the same type of fact-based analysis that we employed in *Virginia Beach*. We likewise employ this type of analysis here, and

decline T-Mobile's request that we use a different methodology for the review of unreasonable discrimination claims. We therefore turn to consider whether the present record supports T-Mobile's argument that the district court erred in determining that the Board's decision did not violate subsection (B)(i)(I).

The record contains extensive evidence that the residents' opposition to T-Mobile's proposal was based on the traditional zoning principle of aesthetic impact. The record shows that the 10-foot extension of the pole would materially alter the visual impact of the pole for nearby residents. The results of a "visibility test" conducted by the Planning Commission staff demonstrated that T-Mobile's proposed facility in this residential area would be taller than any other transmission pole in the vicinity. Additionally, the visual impact of the extended pole would be greater than simply its increased height, because the antennas to be affixed to the top of the extended pole would add a component cylindrical in shape that also could be seen by the nearby residents.

Contrary to T-Mobile's contention, the record does not show that T-Mobile's proposed facility is essentially the same as, or less invasive than, previously-approved facilities erected by AT&T and Verizon. As noted by the district court, AT&T's facility did not increase the height of the pole and was not opposed by members of the surrounding community. And, while Verizon earlier had obtained an extension of the pole from 90 feet to the pole's current height of 100 feet, this fact did not render the Board's denial of T-Mobile's proposed additional ten-foot extension unreasonably discriminatory per se.

As recognized in the Conference Report cited in our decision in *Virginia Beach*, subsection (B)(i)(I) provides a local governing body with the flexibility to treat a proposed facility differently than another facility when there is a difference in the visual impact or aesthetic character of the individual facil-

ities. *See Virginia Beach*, 155 F.3d at 427 n.3 (citing H.R. Rep. No. 104-458, at 208 (1996)(Conf. Rep.)). Here, as we have noted, there was evidence of a difference in the visual impact of T-Mobile's proposed facility, because the aesthetic impact of the pole's increased height was compounded by the cylindrical configuration to be placed near the top of the pole extension.

Additionally, as the district court observed, T-Mobile was required to obtain a special exception from the Board at the time T-Mobile filed its application, while the earlier applications filed by Verizon and AT&T were not subject to this more rigorous and attenuated procedure. To obtain a special exception, T-Mobile was required to demonstrate to the Board that its proposed facility would be "harmonious with and [would] not adversely affect the use . . . of neighboring properties." Zoning Ordinance § 9-006(3). Thus, this heightened standard to which T-Mobile was held further distinguishes T-Mobile's applications from those of Verizon and AT&T, and demonstrates that the Board did not unreasonably discriminate against T-Mobile.

T-Mobile argues, nevertheless, that the Board's implementation of this special exception requirement shows that the Board unreasonably discriminated against T-Mobile. However, because T-Mobile did not raise this argument before the district court, we decline to consider the argument here in reviewing the district court's decision under subsection (B)(i)(I). *See Skipper v. French*, 130 F.3d 603, 610 (4th Cir. 1997).

The record thus shows that the Board's denial of T-Mobile's applications was based on legitimate, traditional zoning principles, and that the facilities earlier approved for Verizon and AT&T can be distinguished on several grounds. Accordingly, we affirm the district court's determination that the Board did not unreasonably discriminate against T-Mobile, and was entitled to summary judgment on that claim.

## IV.

For the reasons stated, we hold that the district court did not err in concluding that T-Mobile failed to establish that the Board effectively prohibited personal wireless services, as proscribed by subsection (B)(i)(II), or unreasonably discriminated against T-Mobile, as proscribed by subsection (B)(i)(I). Therefore, we affirm the district court's holding granting summary judgment in favor of the Board.

*AFFIRMED*

AGEE, Circuit Judge, concurring:

I join in Judge Keenan's fine opinion in its entirety. I write separately to briefly emphasize the "substantial burden" that a plaintiff bears in seeking to show a violation of 42 U.S.C. § 332(c)(7)(B)(i)(II) (the so-called "prohibition clause"), *360° Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cnty.*, 211 F.3d 79, 87-88 (4th Cir. 2000) (*Albemarle County*), and address what I believe to be a flaw in the dissenting opinion.

As the majority opinion correctly states, our cases recognize that a plaintiff can show an effective prohibition in two circumstances: by showing that a locality has a general policy rejecting any siting of wireless facilities, *AT&T Wireless PCS, Inc v. City Council of City of Virginia Beach*, 155 F.3d 423, 428 (4th Cir. 1998), or by showing that the denial of an application for one particular site is "tantamount" to a general prohibition of services, *Albemarle County*, 211 F.3d at 87-88. Maj. Op. at 10. However, our precedents emphasize the difficulty that a plaintiff faces in seeking relief on an effective prohibition claim under the latter approach.

Two cases in particular illustrate this heavy burden. In *Albemarle County*, we rejected outright the possibility that, without more, "case-by-case denials of permits for particular

sites" could be considered an effective prohibition. 211 F.3d at 86. In *USCOC of Virginia RSA#3, Inc. v. Montgomery County Board of Supervisors*, 343 F.3d 262, 268 (4th Cir. 2003), we allowed the possibility that a plaintiff could succeed on an effective prohibition claim based on the denial of a single application "if the [wireless] service could only be provided from a particular site," but we expressly stated that such an approach was "theoretical" and "unlikely in the real world."*

The law of our Circuit is clear that an effective prohibition claim based on the denial of a single siting application is highly unlikely to succeed in light of the considerable deference that the statute affords to localities in the making of individual zoning decisions. The majority opinion does not alter that standard.

The dissenting opinion misreads our precedents to conflate "significant gap" with "effective absence of coverage" Dissenting Op. at 28. The Fourth Circuit has not adopted "a significant gap" as some sort of independent test under § 332(c)(7)(B)(i)(II). To the contrary, we expressly rejected that notion in *Albemarle County*. There, despite being urged to adopt an approach under which "the denial of a permit for a site that is 'the least intrusive means to close a significant gap in service' would amount to a denial of wireless services in violation of [the statute]," we concluded to the contrary, separately identifying the term "significant gap" as one we did not adopt. *Id.*

> [D]eterminations about what constitutes the "least intrusive means" and "a significant gap" in services, would . . . quickly devolve into the broader inquiry

---

*T-Mobile conceded at oral argument that, under our existing precedent, it could not succeed on its effective prohibition claim. I see no reason to bend over backward to grant relief to a litigant that has acknowledged it is not entitled to it under circuit precedent.

indicated by the language of the statute: "Does the denial of a permit for a particular site have the effect of prohibition wireless services.?" *We believe that this statutory question requires no additional formulation* and can best be answered through the case-by-case analysis that the Act anticipates.

*Id.* (emphasis added) (citation omitted). We then stated that even assuming a plaintiff could show the existence of poor service, it would still bear "the 'heavy burden' of demonstrating that denial of its application for one particular site is tantamount to a prohibition in service."

Because I believe that the majority opinion applies the correct standard for an effective prohibition claim as articulated in *Albemarle County*, I am pleased to join it.

DAVIS, Circuit Judge, concurring in part and dissenting in part:

The majority cogently explains the two circumstances in which a local government's denial of a wireless facility application "ha[s] the effect of prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II): (1) where it has imposed a "'blanket ban' on wireless service," such as a "general policy that essentially guarantees rejection of all wireless facility applications"; or (2) where there is an "effective absence of coverage" and "a lack of reasonable alternative sites to provide coverage." Maj. Op. at 10. I agree that this statement is consistent with our precedents. I also agree that this case presents the second type of claim; T-Mobile does not allege either a blanket ban on wireless service or a general policy essentially guaranteeing rejection of all wireless facility applications.

Contrary to the majority's conclusion, however, I am unable to conclude there is no genuine dispute that T-Mobile has failed to meet its burden on its effective-prohibition claim.

A reasonable fact-finder, I believe, could conclude that T-Mobile has an "effective absence of coverage" in its wireless coverage in the vicinity of the intersection of Dolley Madison Boulevard and Georgetown Pike, and that there are no "reasonable alternative sites" to fill that gap. Thus, we should reverse and remand for further proceedings on T-Mobile's effective-prohibition claim.[1]

I.

The wireless signal generated by a particular wireless facility (i.e., a wireless antenna or group of antennas) is strongest near the facility and fades at increasing distances from it, at rates that depend on various factors: the height of the facility, the strength and frequency of the signal emitted by the facility, the surrounding geography, the density of structures in the area, and the number of customers in the vicinity, among other factors. The strength of a wireless provider's coverage in a particular location is measured in negative dBm (decibels relative to one milliwatt). A more negative value (i.e., higher absolute value) represents a weaker signal; a value closer to zero represents a stronger signal. According to T-Mobile's "design criteria," in order to provide "reliable in-building coverage" to its customers at a particular location, the signal received at that location must be at least -76 dBm. Only at that level, T-Mobile has determined, can it provide "sufficient system capacity and high speed data rates" to provide reliable in-building service. J.A. 548. Reliable "in-vehicle coverage" does not require quite as strong a signal, but still requires one measuring -84 dBm.

In the district court, T-Mobile submitted maps that show the strength of its coverage in the area in question. Most are

---

[1]Although I dissent from the majority's disposition of the effective-prohibition claim, I concur in its affirmance of the district court's grant of summary judgment to the Board on T-Mobile's unreasonable-discrimination claim.

radio frequency ("RF") propagation maps, which are generated by a computer model that takes into account the factors that affect signal strength and show the various signal strengths that "can be expected" over the area. J.A. 549. Areas that receive RF signals strong enough to support reliable in-building coverage (-76 dBm or stronger) are displayed in green; areas with signals too weak for in-building coverage, but strong enough for in-vehicle coverage (between -84 dBm and -76 dBm), are displayed in blue; areas with signals too weak even for reliable in-vehicle coverage (weaker than -84 dBm) but sufficient for "on street" coverage are displayed in yellow. These maps show that T-Mobile's current coverage is insufficient to provide reliable in-building service in a portion of the area near the intersection of Dolley Madison Boulevard and Georgetown Pike. In some areas T-Mobile's customers do not even receive coverage strong enough to maintain a reliable connection from inside a vehicle. These data are corroborated by a map showing "drive test data," i.e., measurements of actual signal strength in hundreds of locations along roads in the area. The drive-test maps show miles of roads where T-Mobile's engineers were unable to detect a signal stronger than -84 dBm.[2]

---

[2]The Board contested the admissibility of all of these maps on several grounds, including that T-Mobile did not disclose its experts, whose declarations included the maps as attachments, early enough for the Board to conduct discovery regarding those witnesses to the extent they were serving as expert witnesses. The district court never ruled on the Board's objections to the admissibility of the declarations because it was applying a test under which any detectable RF signal would defeat a wireless provider's effective-prohibition claim; under that standard, the declarations and maps would have been irrelevant. As the majority holds and I agree, this was error, because in this circuit, we do inquire into whether there is an "effective absence of coverage." Because the district court's basis for declining to rule on their admissibility was erroneous, for purposes of this opinion, I assume the maps are properly in evidence. If we were to vacate and remand this action, as I believe we must, the district court would then be in position to exercise its discretion to decide whether the maps should be excluded from evidence based on the timing of T-Mobile's expert disclosures.

To remedy this inability to provide reliable in-building and in-vehicle service to its customers living in and travelling through the area, T-Mobile decided to invest in a new wireless facility, and began investigating possible sites. One of the potential sites was the one at issue here: a ten-foot extension of a power transmission pole belonging to Dominion Virginia Power ("the Pole"), where two of T-Mobile's competitors already had wireless facilities. A facility on the extended Pole, at a height of 108 feet, would provide reliable coverage to much more of the area than existing facilities provide, and, in T-Mobile's view, was consistent with Fairfax County's Comprehensive Plan, which encourages "collocation" of facilities operated by different service providers and discourages the construction of new structures.

In addition to the Pole, T-Mobile investigated more than a dozen potential alternative locations, including several identified by the County. The first set of alternatives consists of locations the Board does not dispute were not reasonably available. These include the Immanuel Presbyterian Church, which was not interested in leasing its property for a telecommunications facility; power transmission poles belonging to Dominion on the grounds of the Potomac School, which was not interested in leasing space below the poles for equipment the facilities would have required; and seven other poles belonging to Dominion, which was unwilling to lease space on those poles because there would be insufficient space for equipment and/or access to the equipment.

Similarly, a nearby park, Clemyjontri Park, was not available because its donation to Fairfax County had been conditioned on its use exclusively for park-related purposes. Two other parks, the Claude Moore Colonial Farm and Turkey Run Park, were too far north; a facility there would not fill the southern portion of the gap in reliable service. At the County's request, T-Mobile also sought permission from the Central Intelligence Agency to install a facility within the CIA grounds; that request was denied for security-related reasons.

Two other alternatives to the 108-foot-high facility were to install (1) a 45-foot facility on the Pole, below the facilities belonging to Verizon and AT&T, or (2) a distributed antenna system ("DAS"), which consists of a network of smaller antennas at several locations rather than an installation on the Pole. T-Mobile considered these alternatives and generated RF propagation maps to determine the extent to which they would fill the gap. As those maps show and the Board does not dispute, although each of those alternatives would somewhat improve in-building and in-vehicle coverage, they would do so to a much lesser extent than would a 108-foot-high facility; a substantial portion of the areas currently without reliable in-building service would remain so. Moreover, a DAS would not work because, at least according to T-Mobile's Zoning Manager, there were not enough existing structures in the area on which DAS equipment could be placed.

The last potential alternative, the one the majority finds fatal to T-Mobile's claim, was the construction of a new tower in Langley Fork Park, located adjacent to a residential subdivision, Evermay. The park is owned by the National Park Service ("NPS") and maintained by the Fairfax County Park Authority ("FCPA"). To construct a new tower in the Park, T-Mobile would need permission from both the NPS and the FCPA. For the FCPA to grant permission, T-Mobile would have to satisfy FCPA Policy 303, which requires that "all other possible locations have been exhausted by the application and that no feasible and prudent alternative exists." J.A. 453. Although an FCPA representative attested that the FCPA "would be open to receiving" a proposal for the construction of a pole, the proposal would "trigger the compliance process." J.A. 674. Another FCPA representative specifically stated that the Authority "would question why co-location on the nearby [Dominion] monopole outside of the park is not possible." *Id.* As I understand the result reached by the majority in this case, T-Mobile must pursue this rather

daunting avenue before it may come back to the Board and, if unsuccessful a second time, to the district court.

## II.

As this case comes to us from the grant of summary judgment to the Board, we must view "the evidence and all reasonable inferences drawn therefrom in the light most favorable to [T-Mobile]." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). This evidence presents two questions, as the majority agrees: First, could a reasonable fact-finder conclude that the absence of reliable in-building coverage and, to a lesser extent, reliable in-vehicle coverage, in the vicinity of the proposed facility, constitutes an "effective absence of coverage"? Second, if there is an effective absence of coverage, could a reasonable fact-finder conclude that T-Mobile has shown there are no "reasonable alternative sites to provide coverage"?

## A.

As an initial matter, I discern no meaningful difference between what the majority calls an "effective absence of coverage," Maj. Op. at 10, (or elsewhere a "legally cognizable absence in coverage," *id.* at 12, or a "legally cognizable deficit in coverage," *id.* at 13) and what a prior panel on which I served referred to as a "significant gap." In *360° Communications Co. v. Board of Supervisors of Albemarle County*, 211 F.3d 79 (4th Cir. 2000) ("*Albemarle County*"), we assumed without deciding that "significant gaps are determined to exist," *id.* at 87-88, and thus expressly reserved the question whether "poor service or significant gaps in service" such as those in Albemarle County "could amount to an absence of service." *Id.* at 88 n.1. We were able to avoid that question because there was evidence of at least two alternative means to provide coverage in the area in question but no evidence in the record of their "feasibility." *Id.* at 88. Thus, regardless of whether there was a significant gap, the wireless provider

could not show it was unable to fill that gap by means other than the facility that had been rejected. *Id.*

Similarly, in *USCOC of Virginia RSA # 3, Inc. v. Montgomery County Board of Supervisors*, 343 F.3d 262 (4th Cir. 2003) ("*Montgomery County*"), there was an alternative plan that would provide coverage that was "[e]quivalent" to that which the rejected plan would have provided. *Id.* at 266. Because the case was not one in which "the service could only be provided from a particular site," the wireless provider could not meet its burden, regardless of the extent of any gap in reliable service. *Id.* at 268. In *AT&T Wireless PCS, Inc. v. City Council of the City of Virginia Beach*, 155 F.3d 423 (4th Cir. 1998) ("*Virginia Beach*"), we also did not consider whether the wireless provider could prevail on the "effective absence of coverage" question. *See id.* at 428-29.[3]

Thus, the question of when a wireless provider's inability to provide reliable in-building and/or in-vehicle coverage constitutes an "effective absence of coverage" is one of first impression in this circuit. We have never before needed to decide whether a particular level of coverage in a particular geographic area constitutes an "effective absence of coverage."

It is true that in *Albemarle County* we rejected the test employed in the Second and Third Circuits for determining

---

[3]I agree with the majority that the FCC's Declaratory Ruling, regardless of whether it was properly promulgated, does not affect our analysis. All the FCC ruled was that a city effectively prohibits wireless services if it denies an application "solely because that service is available from another provider." *In re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, 24 F.C.C. Rcd. 13994, 14000 (2009). That "one-provider rule" was not at issue in *Virginia Beach*, *Albemarle County* or *Montgomery County*, and is not at issue here. To the extent the Declaratory Ruling also questioned particular aspects of our reasoning in *Virginia Beach*, *see id.* at 14017, those concerns were rendered moot by *Albemarle County* and *Montgomery County*.

whether the existence of an alternative site would defeat a wireless provider's effective-prohibition claim. That is, we rejected a test that would compare the "intrusive[ness]" of a rejected facility with that of any alternatives, and allow a wireless provider to prevail if its proposed facility would be the "least intrusive means" by which it could close an existing gap in "service." 211 F.3d at 87. We did not, however, quarrel with the approach those circuits had taken to the "significant gap" prong of the analysis—as the majority acknowledges. *See* Maj. Op. at 10 (noting that *Albemarle County* rejected the Second and Third Circuits' test only "[w]ith regard to the requirement that a plaintiff demonstrate the absence of reasonable alternatives").

For these reasons, I would forthrightly follow *Albemarle County*'s lead in requiring evidence of a "significant gap" in coverage as the first prong of the second type of effective-prohibition claim. That is, I would avoid the majority's preference for the "effective absence of coverage" gloss when "significant gap" would do just fine. But ultimately that choice is inconsequential, for two reasons: (1) there is no discernible difference between those standards and (2) ultimately its discussion of the "effective absence of coverage" test is dicta, because it decides the case solely on the lack-of-reasonable-alternatives prong. Thus, for simplicity's sake, I will adopt the same formulation as that of the majority.

The upshot of our prior treatment of the question is that whether there is an effective absence of coverage is highly fact-specific, one that requires "case-by-case analysis." *Albemarle County*, 211 F.3d at 87. The other circuits that have considered the question have agreed. The First Circuit, which has provided the most thorough explanation of the contours of this analysis, provided a non-exclusive list of considerations that are generally relevant to whether there is a "significant gap": "the physical size of the gap, the area in which there is a gap, the number of users the gap affects," and the percentage "of unsuccessful calls or inadequate service during calls

in the gap area," as well as "whether all of the carrier's users in that area are similarly affected by the gaps." *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 49 (1st Cir. 2009) ("*Cranston*").

In *Cranston* the district court had weighed the relevant factors after a bench trial that included competing expert testimony, and adopted as a "yardstick" -84 dBm as a proper marker in those circumstances for determining whether there was a significant gap in coverage. *Id.* Because the district court's choice of -84 dBm as a threshold and its weighing of the evidence were not clearly erroneous, the First Circuit affirmed the district court's entry of judgment for the wireless provider. *Id.* Similarly, in *MetroPCS, Inc. v. City of San Francisco*, 400 F.3d 715 (9th Cir. 2005), the Ninth Circuit, accepting jurisdiction over an interlocutory appeal certified by the district court, *id.* at 720, affirmed the denial of cross-motions for summary judgment, in part because the record was "replete with contradictory allegations" as to MetroPCS's need to install the wireless facility at issue. *Id.* at 733. The court explained, "While we recognize that the TCA does not guarantee wireless service providers coverage free of small 'dead spots,' the existing case law amply demonstrates that 'significant gap' determinations are extremely fact-specific inquiries that defy any bright-line legal rule." *Id.*

It is true that in dicta in *Albemarle County* we pondered the frequency with which "wireless service could feasibly be provided from only one site," and conjectured that "such a hypothetical seems unlikely in the real world, although gradations of the hypothetical are conceivable." 211 F.3d at 86-87. We did not, however, have occasion to decide what level of "service" the Act entitles wireless companies to provide, instead deciding that, regardless of whether there was a gap in coverage, the existence of alternatives to fill that gap defeated the wireless provider's claim. The majority opinion here thus is wise to avoid giving unwarranted weight to that dicta. As we now know, having wrestled with the implications of 47

U.S.C. § 332(c)(7)(B)(i)(II) alongside our sister circuits for fifteen years, there may very well be scenarios where, as a practical matter, very few sites—and perhaps just one site— would allow a wireless provider to remedy a "legally cognizable deficit in coverage." It may be true that such scenarios are "unlikely," *Albemarle County*, 211 F.3d at 87, and accordingly a wireless provider may find its burden of demonstrating an effective prohibition to be a "heavy" one. But that does not excuse us from deciding whether a particular wireless provider's claim presents such a scenario, just as it does not alter the ordinary burden of proof in a civil case like this one: preponderance of the evidence. In my view, the two-pronged test the majority articulates provides a workable test for making that determination.

In this case, the district court declined to engage in any analysis of the extent of T-Mobile's inability to provide reliable wireless coverage because it read our precedents as allowing an effective-prohibition claim only where there is a "complete absence of T–Mobile's wireless service in the area." *T-Mobile Northeast LLC v. Fairfax Cnty. Bd. of Supervisors*, 759 F. Supp. 2d. 756, 770 (E.D. Va. 2010). As mentioned, it declined even to consider the admissibility of T-Mobile's maps because they would be relevant, the court apparently believed, only if they showed areas with no detectable RF signal at all; because the maps showed T-Mobile could provide some signal in the area, the maps were not "material." *Id.* at 769 n.23. As the majority seems to agree, this reasoning was mistaken, though certainly understandable given the obscurity of our precedents to date. *See* Maj. Op. at 12 (stating the issue as whether T-Mobile is "unable to provide sufficient, reliable in-vehicle and in-building coverage in the area at issue"); *see also Montgomery County*, 343 F.3d at 269 (noting there were alternative means to provide "*quality* wireless service" (emphasis added)).

The problem is, while the majority clarifies some aspects of our analysis, I am afraid it muddles other aspects of our

analysis. While the Telecommunications Act does not guarantee "100% coverage" and "federal regulations contemplate the existence of dead spots," *Albemarle County*, 211 F.3d at 87, the majority recognizes that at some point a wireless provider's inability to provide reliable service in a particular area becomes so significant that it amounts to an "effective absence of coverage." Maj. Op. at 10. Having recognized this possibility, however, the majority later states that the language of subsection (B)(i)(II) "does not encompass the ordinary situation in which a local governing body's decision merely limits the level of wireless services available." Maj. Op. at 13.

The unavoidable tension between these pronouncements illustrates the shortcomings of the majority's approach. The only way the latter could logically follow from the former is if we were to hold that a wireless provider could only prevail on an effective-prohibition claim if there were no detectable RF signal in the area in question. Although, admittedly, our prior cases include language hinting at such a requirement, we never actually adopted the standard, as explained above—and no circuit has come close to adopting such an extreme approach. In fact, while the circuits have split on the second prong of the effective-prohibition analysis, those that have considered the question have uniformly approached the first prong by asking whether there is a "significant gap" in coverage. *See Cranston*, 586 F.3d at 48; *T–Mobile USA v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009); *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 834 n.7 (7th Cir. 2003); *APT Pittsburg Ltd. P'ship v. Penn Twp. Butler Cnty.*, 196 F.3d 469, 480 (3d Cir. 2002); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999) ("*Willoth*").[4]

---

[4]The Eighth Circuit has not adopted a particular standard, but in *USCOC of Greater Iowa, Inc. v. Zoning Board of Adjustment of the City of Des Moines*, 465 F.3d 817 (8th Cir. 2006), assumed without deciding that a zoning board's decision that prevents a wireless provider from improving service in "a relatively small area [where its service is] less

The majority apparently recognizes that we should not split with our sister circuits and go down that lonely road, as ultimately it does not decide whether there is a triable issue on the effective-absence-of-coverage prong. But this renders even more inexplicable its statement in dicta that subsection (B)(i)(II) does not grant relief if a local government "merely limits" a wireless provider's coverage. Rather, because subsection (B)(i)(II) surely is not limited to areas without any detectable RF signal, the subsection must *necessarily* "encompass" a scenario in which a local government's decision "limits the level of wireless services available," where that decision leaves the provider with a significant gap in reliable coverage.

Because a wireless device requires not just *some* signal to provide reliable service but rather a *sufficiently strong signal*, the question whether a gap in service is significant is one of degree, and necessarily depends on a variety of factors, such as those enumerated by the First Circuit in *Cranston*. If the Board's decision here had prevented T-Mobile from providing, say, even a -100 dBm signal for large swaths of populated areas of McLean, which apparently would be insufficient for almost any use of a wireless device, then presumably (though we need not decide) T-Mobile could show an effective absence of coverage, i.e., a significant gap. Conversely, if the Board's decision had prevented T-Mobile from providing reliable in-building coverage to merely a handful of homes, then we might have needed to decide (though here, we need not) whether the "effective absence of coverage" was *de minimis* and therefore no reasonable factfinder could conclude T-Mobile is entitled to relief. *See Willoth*, 176 F.3d at 643-44

---

than optimal" could constitute an effective prohibition, so long as the provider has "adequately investigate[d] all feasible alternative sites." *Id.* at 825. There, the provider's claim failed because it failed to conduct a reasonable investigation of alternatives and so the court was "unable to conclude that the [site at issue] was the only location for a cellular tower that would remedy USCOC's coverage issue." *Id.*

(noting in dicta that "[w]here the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be *de minimis* so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service"). Indeed, T-Mobile conceded this latter possibility at oral argument. Oral Arg. Tr. at 8:25.

On the facts here, the core problem with the majority's effective-absence-of-coverage analysis (though not its holding, as ultimately it avoids deciding the issue) is its failure to acknowledge that this case does not present either extreme scenario. Even the Board concedes that in the vicinity of the Pole there is a "mix" of areas with varying strengths of coverage, in only some of which T-Mobile's customers receive reliable in-building coverage. Appellee's Br. at 23. T-Mobile presented evidence that in a substantial portion of the area in question, which includes developed residential areas and heavily trafficked roads, a T-Mobile customer would be unable to reliably use T-Mobile's wireless network, especially from inside homes and buildings, but also at times from inside vehicles—and even sometimes just standing outside. Indeed, the Board does not seem to dispute any of that evidence. Thus, we are squarely presented with the question whether those deficiencies in coverage rise to the level of an "effective absence of coverage."

We could, of course, avoid this question if T-Mobile's claim failed as a matter of law on the lack-of-reasonable-alternatives prong. This is the tack the majority takes, concluding, as it does, that T-Mobile failed as a matter of law to satisfy its burden on the lack-of-reasonable-alternatives prong. In certain circumstances, such as in *Albemarle County*, that is a tenable approach. Unlike in *Albemarle County*, however, T-Mobile has presented substantial evidence concerning alternative sites, evidence that, in my view, precludes us from

avoiding the question we reserved in *Albemarle County*, as I will explain below. Accordingly, I believe we must decide whether a reasonable fact-finder could conclude that T-Mobile has proven an "effective absence of coverage."

In my view, between T-Mobile's RF propagation maps, drive-test map, affidavits, and other evidence, the answer must be "yes." Whether a particular number of customers in a particular geographic area cannot reliably use cellular wireless devices indoors and whether that absence of in-building service constitutes an effective absence of coverage are fact-intensive questions, ones on which, on the facts presented here, reasonable fact-finders could disagree. Although we do not know some details of the scope and extent of the gap in coverage, such as precisely how many homes are affected or how often T-Mobile's network drops calls made in the area in question, a party seeking to defeat summary judgment need not prove every fact it would prove at trial; it need only proffer sufficient evidence to show that it could prevail at trial. This, I believe, T-Mobile has done.[5]

---

[5]In this regard, it is difficult to know what to make of our good friend's concurring opinion, which is offered to "emphasize the 'substantial burden' that a plaintiff bears in seeking to show a violation of 42 U.S.C. § 332(c)(7)(B)(i)(II)." Why a separate opinion is needed to voice such "emphasis" is quite unclear. Amorphous formulations such as "substantial burden" and "heavy burden" rarely aid analysis of actual cases; such formulations are descriptive, not prescriptive. No one believes it is or should be "*easy*" for a wireless service provider to persuade a court to reject a local zoning authority's decision denying a requested permit. But absolutely nothing in our precedent (or any other court's precedent) suggests that the customary civil risk of non-persuasion (preponderance of the evidence) or well-settled Rule 56 summary judgment standards (absence of genuine disputes of material fact and entitlement to judgment as a matter of law) do not apply under the Act. Surely, the concurrence agrees with this statement.

Moreover, the assertion that I am "bend[ing] over backward" misses the mark entirely. *See* Concurring Op. at 22 n.*. T-Mobile's alleged concession at oral argument is quite accurate: under the erroneous view of the law applied by the district court, which believed our precedents required

### B.

This brings me to the second question: whether T-Mobile has shown that a reasonable fact-finder could conclude there are no "reasonable alternative sites to provide coverage." As the majority notes, the standard we apply as to this second prong of the effective-prohibition analysis differs slightly from that adopted by the Second, Third and Ninth Circuits. Those courts, instead of requiring a "lack of reasonable alternative sites," require that the proposed facility be "the least intrusive means" to close the gap in service. *See MetroPCS*, 400 F.3d at 734; *APT Pittsburg Ltd.*, 196 F.3d at 480; *Willoth*, 176 F.3d at 643. In *Albemarle County*, we expressly rejected the "least intrusive means" test as "read[ing] too much into the Act," instead leaving the factual analysis to be conducted on a "case-by-case" basis. 211 F.3d at 87. Likewise, the First Circuit has also declined to define the second prong and instead left it as a "factual question for the trial court to resolve." *Cranston*, 586 F.3d at 52.

As the majority explains, instead of engaging in a comparative "intrusive[ness]" analysis, we instead inquire into whether a wireless provider has shown that there is "a lack of reasonable alternative sites to provide coverage." Maj. Op. at 10. This standard incorporates, as it must, two subsidiary questions: (1) whether a proffered alternative exists, i.e., is "technically infeasible [or] practically unavailable," Maj. Op. at 12-13, and (2) whether in fact the alternative would "pro-

---

a "blanket ban" for a service provider to prevail in an effective prohibition case, T-Mobile (and any similarly-situated service provider) does lose. Fortunately, despite the confusion evident in the concurrence, the majority opinion soundly rejects the "blanket ban" formulation, and in any event escapes confronting prong one, the "effective absence of coverage" issue, by deciding the case solely on prong two, the "reasonable alternative" issue. Thus, T-Mobile's concession is irrelevant to the disposition of this case.

vide coverage," i.e., would effectively fill the existing gap.[6] We have previously explained that whether a particular alternative site is reasonably available depends on whether "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Albemarle County*, 211 F.3d at 88. We do not require providers "to endure repeated denials by local authorities until only one feasible alternative remained," a standard that would be "a poor use of time and resources for both providers and local governments alike." *MetroPCS*, 400 F.3d at 734. "Ultimately the question is a practical inquiry into feasible, available alternatives." *Cranston*, 586 F.3d at 52-53. As the First Circuit has explained, the purpose of inquiring into the existence of alternatives and their feasibility is to balance "competing interests": (a) the need for wireless carriers to "build more facilities, especially in populated areas, to continue providing reliable coverage," (b) the importance of "promoting competition in the wireless communications market," and (c) "local governments' primary authority to regulate land use." *Id.* at 51-52.

We considered these questions in both *Albemarle County* and *Montgomery County*. In both cases, the effective-prohibition claims failed as a matter of law because the wireless providers had not shown an absence of reasonable alternative sites to provide coverage. In *Albemarle County*, the wireless provider had acknowledged there were alternative sites, and had failed to provide evidence that those alternatives were not "feasible." 211 F.3d at 82. In *Montgomery County*, not only was there an alternative facility (a 195-foot tower instead of a 240-foot tower) that "would provide wireless capabilities to a significant area of the county currently without quality wireless service"; the county had in fact already granted a permit for an alternative tower. 343 F.3d at 268-69.

---

[6]This is similar to the Seventh Circuit's approach, which requires a wireless provider to show that the proposed facility is the "only feasible plan." *VoiceStream Minneapolis*, 342 F.3d at 833, 834–35 (7th Cir. 2003).

Here, in contrast, T-Mobile has offered substantial evidence that, to the extent there are alternative sites from which T-Mobile could provide coverage, those alternatives either (a) are not reasonably available or (b) would not fill the existing gap in coverage. Most of that evidence the Board does not dispute. There are three alternatives, however, the Board argues T-Mobile has not adequately shown are either not reasonably available or would not fill the gap: a new tower in Langley Fork Park; a 45-foot-high facility on the same Dominion Pole it sought to extend for a 108-foot-high facility; and a distributed antenna system.

The majority finds the possibility of constructing a new tower in Langley Fork Park fatal to T-Mobile's claim. I agree that if the Park truly were a "reasonable alternative," then that fact alone would be fatal to T-Mobile's claim; the denial of the Dominion pole application would not effectively prohibit T-Mobile from providing wireless services in the area, regardless of whether the existing gap in coverage is significant. But, in my view, on this record, T-Mobile could convince a reasonable fact-finder that constructing a new tower in the Park is not a reasonable alternative.

As T-Mobile showed, the Fairfax County Park Authority would only be willing to approve the construction of a cellular tower in the Park if "all other possible locations have been exhausted" and if "no feasible and prudent alternative exists." J.A. 453. This put T-Mobile in a Catch-22: it could construct a tower in the Park only if there were no other "feasible and prudent alternative[s]," *id.*, but could prevail on an effective-prohibition claim only if the Park was "practically unavailable" as an alternative. Maj. Op. at 13. Furthermore, although an NPS representative said the NPS "would be open to receiving" a proposal for the construction of a pole, the submission of such a proposal would merely "trigger the compliance process," J.A. 674, and an FCPA representative specifically told T-Mobile that the FCPA "would question why co-location on the nearby [Dominion] monopole outside of the park is not

possible." J.A. 453. Finally, as T-Mobile represented at oral argument (without contradiction), the FCPA has never approved the construction of a cellular tower in Langley Fork Park.

Given this conflicting evidence on the dispositive issue, "reasonableness," only if the summary judgment standard were flipped on its head could the majority's conclusion withstand scrutiny. I fail to see how no reasonable fact-finder could conclude, based on this evidence, that further "reasonable efforts" to obtain permission to build a new tower in the Park "are so likely to be fruitless that it is a waste of time even to try," *Albemarle County*, 211 F.3d at 88, or, in the majority's words, "would be futile." Maj. Op. at 14. Surely the majority does not mean to require T-Mobile "to endure repeated denials by local authorities until only one feasible alternative remained." *MetroPCS*, 400 F.3d at 734, a requirement that would run contrary to the Act's express goal of "encourag[ing] the rapid deployment of new telecommunications technologies." Pub. L. 104-104, 110 Stat. 56, 56 (1996). The question is simply a much closer question than was the feasibility of the alternatives at issue in *Albemarle County* and *Montgomery County*, and far too close to be resolved on summary judgment.[7] Although perhaps T-Mobile's argument would be stronger if it had developed the record before the Board somewhat more on the unlikelihood of winning approval for a pole in the Park, its failure to do so does not, in my view, preclude a reasonable fact-finder from finding

---

[7]Whether "future attempts to gain approval for [other] wireless facilities to enhance its coverage" in Fairfax County would be fruitless, and whether the Board "has a strong history of approving wireless facilities, including applications for wireless facilities submitted by T-Mobile," Maj. Op. at 16, are irrelevant to this category of effective-prohibition claims. The question is whether approval for the specific alternatives at issue (e.g., a new tower in Langley Fork Park) is so unlikely that it would be a waste of time for T-Mobile to try.

that further reasonable efforts to obtain permission from the FCPA are likely to be fruitless.[8]

Because I believe a reasonable fact-finder could conclude the Park was not a reasonably available alternative, I would reach the question of the availability of the two other alternatives: a distributed antenna system and a 45-foot facility on the Pole, below AT&T's and Verizon's facilities. If we could say that these alternatives were reasonably available and that the gap that would remain would not be significant—and that no reasonable fact-finder could conclude otherwise—then the existence of one or both of these alternatives would defeat T-Mobile's claims as a matter of law. The fundamental problem with that approach is that T-Mobile's RF propagation maps show that both a DAS and a 45-foot facility would fill only part of the existing gap in reliable in-building coverage. This brings us right back to the vexing question the majority wishes to avoid: at what point does a wireless provider's inability to provide reliable in-building or in-vehicle service rise to the level of an effective absence of coverage? This question cannot be resolved as a matter of law on these facts for the same reasons as those stated above.[9]

---

[8]It seems T-Mobile did not present an RF propagation map showing the extent to which a new tower in the Park would provide reliable in-building service to T-Mobile customers in the area who are currently without such service. But that failure does not mean its claim fails as a matter of law, because whether an alternative would provide adequate coverage is only part of the analysis under the lack-of-reasonable-alternatives prong. If a proffered alterative is simply not practically available, then a wireless provider can prevail, regardless of whether the alternative site would provide adequate coverage. Thus, T-Mobile's apparent decision not to demonstrate the coverage a tower in the Park would provide simply means that, to prevail, it must show that further reasonable efforts to seek permission to construct such a tower are likely to be fruitless.

[9]Because a reasonable fact-finder could conclude that a DAS or 45-foot facility would not fill the effective absence of coverage, this case is not one where a wireless provider rejected an alternative site or alternative technology solely on the basis of cost. Thus, we need not decide whether a potential alternative that is technically feasible and would fill an existing gap, but would be very expensive to implement, would be rendered "practically unavailable" on the basis of cost.

### C.

For these reasons, in my view, there are genuine issues of material fact on both prongs of our effective-prohibition analysis. Our review of an effective-prohibition claim might look different if there were properly promulgated FCC regulations setting particular threshold coverage levels subsection (B)(i)(II) entitles a company like T-Mobile to provide. But the agency has not acted on this question, and so we are left with the fact-intensive questions of whether T-Mobile's gap in service constitutes an "effective absence of coverage" and whether potential alternative sites are "reasonable." Thus, as in any such case, we should remand. Presumably, the parties would proceed to a bench trial, though conceivably the district court could decide that additional discovery and/or renewed motions for summary judgment, or possibly further remand to the Board, would be appropriate, now that we have clarified the standard we apply in effective-prohibition cases.

### III.

For these reasons, although I join the court's opinion as to T-Mobile's unreasonable-discrimination claim, I respectfully dissent from its disposition of T-Mobile's effective-prohibition claim.